## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JAMES RAYNOR,                :
      *Plaintiff*,            :
                           :
      v.                  :          Case No. 3:22-CV-1193 (OAW)
                           :
WASHINGTON, et al.,        :
      *Defendants*.       :

### INITIAL REVIEW ORDER

Pro se Plaintiff, James Raynor ("Mr. Raynor" or "Plaintiff"), currently incarcerated at Garner Correctional Institution, has filed a complaint pursuant 42 U.S.C. § 1983, against Warden Washington, Captain Lugo, Litigation/F.O.I. Santiago, the Freedom of Information Commission ("FOIA Commission"), RN Adriana DeBarros ("Nurse DeBarros"), RN Laura Oliveras ("Nurse Oliveras"), RN Chass Rosado ("Nurse Rosado"), Dr. Gerald Valletta ("Dr. Valletta"), R.C.O.O. Mike Greene ("Officer Green"), and C.O.O. Robert Richeson ("Officer Richeson"). Plaintiff alleges that he was given a Moderna COVID-19 booster shot when he consented to receive only the Janssen ("J&J" or "Johnson & Johnson") COVID-19 vaccine and, eventually, its booster shot. Plaintiff names Defendants in their individual and official capacities, seeking damages and an order to preserve Department of Correction video of his encounters with Defendants.

### I.       STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, the court must review prisoner civil complaints and dismiss any portion that "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from

1

such relief." *See* 28 U.S.C. § 1915A(b)(1)–(2).  Although highly detailed allegations are not required, the Complaint must "contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  This plausibility standard is not a "probability requirement" but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully."  *Id.*

In undertaking this analysis, the court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber v. Metro Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  However, the court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause of action will not do."  *Iqbal*, 556 U.S. at 678.  Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Twombly*, 550 U.S. at 555).  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

With respect to pro se litigants, it is well-established that "[*p*]*ro se* submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'"  *Matheson v. Deutsche Bank Nat'l Tr. Co.*,

2

706 F. App'x 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 3006) (per curiam)); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards that formal pleadings drafted by lawyers.'" (internal citations omitted)).   This liberal approach, however, does not exempt pro se litigants from the minimum pleading requirements described above: a pro se complaint still must "'state a claim to relief that is plausible on its face.'"  *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quoting *Iqbal,* 556 U.S. at 678).   Therefore, even in a pro se case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted), and the court may not "invent factual allegations" that the plaintiff has not pled.  *Id.*

## II.    BACKGROUND

The incident underlying this action occurred while Plaintiff was confined at Garner Correctional Institution ("Garner").   On August 4, 2021, Plaintiff consented to receive a COVID-19 vaccine.   Complaint, ECF No. 1 at ¶ 12.   He had decided to receive the J&J vaccine after research, primarily because it was a one-dose vaccine while the others required two doses.  *Id.*   On December 8, 2021, nursing staff informed the inmates at Plaintiff's housing unit that all vaccinated persons now needed a booster shot.  *Id.* ¶ 13.

Plaintiff told the nurses he did not need a booster because he had received the one-dose J&J vaccine.  *Id.* ¶ 14.   He produced his vaccine consent form, *id.* ¶ 15, and

was told to show it to the nurse supervisor, *id.* ¶ 16.

Plaintiff repeated to Nurse DeBarros his explanation for not needing a booster, and he expressed concern over mixing vaccines from different manufacturers. *Id.* Nurse DeBarros told him that the brand of his original vaccine did not matter, and that he needed a booster shot to protect himself and others. *Id.* ¶¶ 17-18. Plaintiff continued to insist he did not want to mix brands and asked the nurse whether J&J made a vaccine booster. *Id.* ¶18. The nurse said that she would ensure that Plaintiff received a J&J booster if that would ease his concerns, and Plaintiff agreed to take a J&J booster. *Id.*

After he received the booster, Plaintiff asked the nurse to update his COVID card to so indicate. *Id.* ¶ 19. The nurse said she could not do so at that time and told Plaintiff to have the unit officer call the medical unit the next morning for that purpose. *Id.*

While Plaintiff was in the medical unit lobby the next morning, Nurse Oliveras took his COVID card. *Id.* ¶¶ 20—21. When she returned it, it indicated that the booster brand was Janssen (J&J) and listed the lot number and the date it was administered. *Id.* ¶ 21.

On April 4, 2022, Plaintiff was called to the medical unit where Nurse Rosado told him that he required a vaccine booster and that she was going to administer it. *Id.* ¶ 22. Plaintiff explained that he had received his J&J vaccine in August 2021 and a J&J booster in December 2021. *Id.* ¶ 23. Plaintiff refused to take a second booster shot and offered to show proof of his J&J booster, by way of his COVID vaccine card. *Id.* ¶ 24.

Nurse Rosado said that there was no J&J booster because it was a single-dose vaccine. *Id.* ¶ 25. Plaintiff said that he had explained to the nurses in December that he would only accept a J&J booster because he did not want to mix brands, and that Nurse

4

DeBarros had assured him that he had received a J&J booster.  *Id.*  Nurse Rosado checked computer records and confirmed that Plaintiff had received a booster in December 2021, but said that he had received a Moderna booster, not J&J.  *Id.* ¶ 26. Nurse Rosado showed Plaintiff the computer screen.  *Id.* ¶ 27.  She told Plaintiff that people can mix vaccine brands and that many do so.  *Id.*  Plaintiff insisted that, as she did not work for the CDC, the nurse did not know what any vaccine would do to the body and stated that the medical unit had violated his freedom of choice.  *Id.*

Plaintiff requested a copy of the information but was told to contact the medical records unit.  *Id.* ¶ 28.  He refused to take a second booster shot and asked to leave.  *Id.* ¶ 29.  When Nurse Rosado tried to alleviate Plaintiff's health risk concerns, he explained that his issue was that the nurses had lied to him and had violated his choice of medical and vaccination decisions.  *Id.* ¶ 30.  Plaintiff confirmed that his records showed he had only received J&J vaccines and he asked his counselor to call the medical unit to see whether he could show them to Nurse Rosado.  *Id.* ¶ 32.  Nurse Rosado refused to speak about the topic, and directed him to the medical records unit.  *Id.*

The same day, Plaintiff submitted an inmate request to Ms. Acosta in the medical records unit seeking all records with his name, inmate number, and signature concerning the COVID-19 vaccine and booster, including the vaccine brands, dates, and lot numbers. *Id.* ¶ 33.

On April 24, 2022, Plaintiff and his cellmate tested positive for COVID-19 and were transferred to the MacDougall Correctional Institution COVID-19 Unit.  *Id.* ¶ 34.  On May 5, 2022, Plaintiff was cleared by the medical staff and was returned to Garner.  *Id.* ¶ 35.

On May 13, 2022, Plaintiff received the requested medical records.  *Id.* ¶ 36.  He was given four documents.  *Id.* ¶ 37.  The first two documents were the consent forms he signed prior to receiving the vaccine and booster.  *Id.*  The third form, dated August 4, 2021 and electronically signed by the nurse at 8:32 p.m., showed that Plaintiff was given the J&J vaccine at 9:00 a.m.  *Id.* ¶ 38.  The fourth form, signed by Nurse DeBarros, showed that Plaintiff was given a Moderna booster on December 8, 2021.  *Id.* ¶ 40.  Although the vaccine lab was set up in Plaintiff's housing unit between 11:00 a.m. and noon on December 8, 2021, the form stated that Plaintiff was given the booster at 3:37 p.m. and was signed at the same time.  *Id.* ¶ 41.  The consent form for the booster showed that Plaintiff only consented to receive a J&J booster.  *Id.*

Over the next two days, Plaintiff submitted inmate requests to Dr. Valletta and to nurse supervisors DeBarros and Oliveras stating that he had been given a booster he did not want and requesting a complete physical examination with lab tests on his blood, urine, and lungs to ensure that his internal organs had not been affected by the mix of vaccine brands.  *Id.* ¶ 42.

On May 31, 2022, Plaintiff was called to the medical unit and assumed, wrongly, that the call was in response to his requests.  *Id.* ¶ 43.  When Plaintiff's appointment was concluded, Nurse DeBarros questioned him about the requests he had submitted and asked to see his COVID card.  *Id.* ¶¶ 47-48.  They were speaking in close proximity to Officer Bridschage.  *Id.* ¶ 49.  When Plaintiff noticed that Officer Bridschage was listening, he asked Nurse DeBarros to respond to his request in writing and asked to be called back for a physical.  *Id.* ¶ 50.  When Plaintiff asked Nurse DeBarros why she needed to see

his COVID card, she said she wanted to verify the vaccine information.  *Id.* ¶ 51.  Plaintiff explained that he memorized the vaccine's lot number, and asked to see what Nurse DeBarros would be verifying by reviewing his vaccination card.  *Id.*  Nurse DeBarros offered to verify the information in his presence, if he would produce the card.  *Id.* ¶ 52. She became upset when Plaintiff asked to leave the medical unit and said that he wanted to consult his attorney before producing his card.  *Id.*

On June 3, 2022, Dr. Valletta called Plaintiff to his office in the medical unit.  *Id.* ¶ 53.  Once there, Plaintiff met with an intern while Dr. Valletta worked at his computer.  *Id.* ¶¶ 53-54.  When Plaintiff mentioned getting the "wrong" vaccine booster, Dr. Valletta confronted him about his refusal to give Nurse DeBarros his COVID card.  *Id.* ¶ 56.  When Plaintiff stated that he had decided to bring his card to show Nurse DeBarros, Dr. Valletta asked for the card.  *Id.* ¶ 57.  Plaintiff had a copy of the card in a file folder.  *Id.*  Dr. Valletta took the folder from Plaintiff and left the office.  *Id.*  Plaintiff followed stating that he did not grant Dr. Valletta permission to take the folder, but Dr. Valletta ignored him and went to a back office.  *Id.* ¶ 58.

Nurse Oliveras returned Plaintiff's folder about ten minutes later.  *Id.* ¶ 63.  She said that they had verified the information on Plaintiff's COVID card with their records and the brand and lot numbers matched.  *Id.*  Nurse Oliveras denied Plaintiff's request to see the records because the records include confidential information about other inmates.  *Id.* She appeared confused when Plaintiff asked for a redacted copy of the records.  *Id.*

Nurse Oliveras told Plaintiff that whenever a vaccine booster was given, the nurse administering the booster should record the information on the inmate's COVID card in

front of the inmate and sign the card.  *Id.* ¶ 64.  Plaintiff explained that this procedure was not followed.  *Id.* ¶ 65.  The following day, Plaintiff filed two Health Services Administrative Remedies, one for administrative issues, the other for diagnosis and treatment.  *Id.* ¶ 67.

On June 8, 2022, Plaintiff submitted an inmate request to Nurse Oliveras asking what she and Dr. Valletta had done with his COVID card after Dr. Valletta took the folder from him.  *Id.* ¶ 68.  She did not respond.  *Id.* ¶ 69.

Plaintiff submitted additional requests to the medical records unit seeking information about the COVID-19 vaccines and boosters, especially the J&J booster.  *Id.* ¶ 70.  He asked whether J&J even made a booster, if so, whether it was CDC approved, and the type of boosters administered in his housing unit on December 8, 2021.  *Id.* ¶ 71. Ms. Acosta responded that she had forwarded his request to Officer Greene.  *Id.* ¶ 72.

The response to his request stated only that vaccines produced by Moderna, Pfizer, and J&J were administered on or around December 8, 2021.  *Id.* ¶ 73.  Officer Greene did not indicate whether J&J produced a booster vaccine or, if so, whether it was CDC approved as of December 2021.  *Id.* ¶ 74.  He also failed to respond to a separate letter about this same issue.  *Id.*

On June 16, 2022, Warden Washington, C.O.O. Richeson, Dr. Johnny Wright, and Dr. Freston were touring the unit, and Plaintiff spoke to them about his medical concerns, and about his issues with Dr. Valletta and Nurses DeBarros and Oliveras.  *Id.* ¶ 75.  Dr. Richeson told Plaintiff that "he was the person responsible for ordering all vaccines and that he had not ordered the Johnson & Johnson vaccine in a [l]ong while . . . ."  *Id.* ¶ 76. He said that it was likely that Plaintiff had been given a Moderna booster and that he

would look into Plaintiff's concerns.  *Id.* ¶ 77.  Dr. Wright and Warden Washington agreed that Plaintiff probably had been misled and Warden Washington said he also would look into the matter.  *Id.*

Dr. Richeson took notes and asked Plaintiff to send him copies of the medical documents by U.S. mail.  *Id.* ¶ 78.  After a few weeks, Plaintiff wrote to Dr. Richeson asking about the last time he ordered the J&J vaccine and whether J&J produced a booster.  *Id.* ¶ 79.

Shortly after Plaintiff contacted Dr. Richeson by U.S. mail, he "experienced intimidation and negative backlash from Dr. Valletta, Nurses Oliveras [and] DeBarros[,] and an unknown woman in a white doctor's coat."  *Id.* ¶ 80.

On June 28, 2022, Officer Fowler told Plaintiff that he was wanted in the medical unit and that someone would escort him there.  *Id.* ¶ 81.  Officer Fowler did not know who wanted to see Plaintiff or why an escort was required.  *Id.*  Plaintiff waited for about 30 minutes before he had "to lock up for count time[,]" but no one came to get him.  *Id.* ¶ 82. Later that afternoon, Officer Ellis told Plaintiff he had been ordered to take Plaintiff to the medical unit.  *Id.* ¶ 83.  Plaintiff worried that he was being "set up" to be taken to segregation or transferred.  *Id.* ¶ 84.

When he arrived at the medical unit, Nurse Oliveras took him to Dr. Valletta's office. *Id.* ¶ 85.  The lights were dim.  *Id.*  A woman in a white doctor's coat also was present. *Id.* ¶ 86.  Nurse Oliveras said they wanted to discuss Plaintiff's health concerns regarding the booster and asked what he wanted.  *Id.* ¶ 87.  Plaintiff said he wanted to know why no one would explain what had happened in writing, "why he was lied to[,] and what

vaccine he was given." *Id.* ¶ 88.  Dr. Valletta said that they did not have to respond to his request or grievance in writing.  *Id.* ¶ 90.  Plaintiff again requested a written response because he would not remember everything they said.  *Id.* ¶ 91.  Nurse DeBarros joined them and asked Plaintiff why he kept writing requests when she had given him the correct booster.  *Id.*  Plaintiff felt he was being pressured to withdraw his request and grievance. *Id.* ¶ 92.

On July 7, 2022, Plaintiff appealed his two health services administrative remedies for lack of response.  *Id.* ¶ 94.  Later that day, he received responses.  *Id.*  Although she was not the Health Services Administrative Remedies Coordinator or designee, Nurse DeBarros responded to the grievance.  *Id.* ¶¶ 95-96.  As she was involved in the matter, her response violated prison directives.  *Id.* ¶ 96.

Plaintiff received a response from C.O.O. Richeson stating that the nurse erroneously put Plaintiff's name on the Moderna accountability sheet, but that he actually was given the J&J booster.  *Id.* ¶ 97.  Nurse Rosado, the Health Services Administrative Remedies Coordinator, allegedly delayed the grievance process by failing to timely return receipts.  *Id.* ¶ 99.

III.    **DISCUSSION**

Plaintiff lists seven causes of action: (1) Nurse DeBarros administered a vaccine booster to which he did not consent in violation of his rights under the Eighth Amendment; (2) Nurse DeBarros's actions constitute negligent infliction of emotional distress; (3) the attempts by Dr. Valletta, Nurse Oliveras, and Nurse DeBarros to intimidate Plaintiff to

withdraw his health services administrative remedy constitute negligent infliction of emotional distress; (4) Nurse DeBarros's action in falsifying medical records and Plaintiff's COVID-19 vaccine card to mislead Plaintiff to believe he had received the correct vaccine booster constitutes deliberate indifference under the Eighth Amendment and intentional infliction of emotional distress; (5) the failure by Dr. Valletta, Nurse DeBarros, Nurse Oliveras, and Nurse Rosado to create a medical incident report constitutes deliberate indifference under the Eighth Amendment and negligent infliction of emotional distress; (6) the disregard of Plaintiff's requests to defendants Santiago and Lugo to preserve video footage of his encounters with medical and custody staff violated Plaintiff's right to due process and constitutes intentional infliction of emotional distress; and (7) C.O.O. Richeson's failure to tell Plaintiff when he last ordered any J&J vaccines or boosters in December 2021, which was intended to cover up the nurse's negligence, constitutes deliberate indifference in violation of the Eighth Amendment.

    A. <u>Informed Consent</u>

Although Plaintiff characterized as Eighth Amendment deliberate indifference his claim that Nurse DeBarros administered the Moderna booster, that claim actually is an alleged violation of the Fourteenth Amendment. The Eighth Amendment concerns the way medical treatment is provided to prisoners. *See Pabon v. Wright,* 459 F,3d 241, 253 (2d Cir. 2006); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (holding that a failure to properly address serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment). The Fourteenth Amendment protects the prisoner's liberty interest in making decisions affecting his health. *See Pabon*, 459 F.3d at 253. "The right

11

to make these decisions, and the corollary right to the information necessary to make them intelligently, is recognized in order to vindicate this fundamental liberty interest in bodily integrity, not to protect against treatment that may amount to cruel and unusual punishment." *Id.*

Plaintiff does not allege that he suffered any known physical harm from receiving a Moderna booster. Thus, his challenge is not to the treatment itself, but that he did not consent to receive a booster from that company. The court considers his claim as a Fourteenth Amendment claim for lack of information upon which to make an informed medical decision. In the context of a prisoner's refusal of treatment, the Second Circuit has recognized that "there exists a liberty interest in receiving such information as a reasonable patient would require in order to make an informed decision as to whether to accept or reject proposed medical treatment." *Pabon v. Wright*, 459 F.3d 241, 250 (2d Cir. 2006). "To establish a violation of this right, a prisoner must show that (1) government officials failed to provide him with such information; (2) this failure caused him to undergo medical treatment that he would have refused had he been so informed; and (3) the officials' failure was undertaken with deliberate indifference to the prisoner's right to refuse medical treatment." *Id.* at 246; *see Blaine v. Burnes*, 2019 WL 1596573, at *3 (D. Conn. Apr. 15, 2019).

Once a prisoner satisfies these elements, the court must consider the state's interest. "[A] prisoner's right to refuse medical treatment need not be honored if legitimate penological interests require the prisoner to be treated. If prison officials, including doctors, identify situations in which they reasonably believe that treatment is required,

notwithstanding the prisoner's asserted right to refuse it, the right must give way." *Pabon*, 459 F.3d at 252.

Plaintiff contends that he decided to take the J&J vaccine primarily because it was a one-dose administration. He then alleges that he did not want to mix brands. Although he alleges no facts suggesting that doing so would expose him to known dangers, and although medical staff assured him that there were none, the brand of vaccine could be information a reasonable patient would consider necessary to make an informed decision. Plaintiff alleges that Nurse DeBarros deliberately concealed the fact that he was receiving a Moderna booster, when he had stated his interest in only receiving the J&J brand. At this early stage of the proceedings, Plaintiff has alleged sufficient facts to satisfy the requisite elements of this claim.

Next the court considers the state's interest. Research reveals a case in which a prisoner asserted a claim for violation of his right to informed consent where the defendant administered a COVID-19 vaccine "without having first observed informed consent protocol." *See Bird v. Martinez-Ellis*, 582 F. Supp. 3d 909, 917 (D. Wyo. 2022). After noting that although "the Tenth Circuit has [not] yet ruled whether the Fourteenth Amendment requires inmates be provided with informed consent in order to reasonably accept or decline medical treatment," the *Bird* court analyzed the claim, in the alternative, under the Second Circuit's standard, as set forth in *Pabon*. *Id.* at 918—19. The court noted that even if the prisoner met the three elements of the claim, the state's interest outweighed the prisoner's right to refuse treatment. Specifically, the court observed that "[j]ust because the WDOC has not mandated vaccinations for all prisoners or staff does

not mean the administration of COVID-19 vaccines in March 2021 to any prisoner who wanted one—in an effort to prevent a COVID-19 outbreak—was not a legitimate penological interest outweighing the prisoner's right to informed consent." *Id.* at 921. Relatedly, courts have recognized that there is no constitutional violation where an inmate is provided another medication than the one requested. *Bryant v. Wright*, 2010 WL 3629443, at *8 (S.D.N.Y. Aug. 31, 2010) (citation omitted); *see also McBride v. Gomez*, 1994 WL 37816, at *1 (S.D.N.Y. Feb. 8, 1994) (noting that there being "no right to the medical treatment of one's choice," inmate's objection that he was not provided his "preferred brand" of pain medication did not rise to the level of a constitutional violation), *aff'd*, 48 F.3d 1213 (2d Cir. 1994).

Here, the Department of Correction was administering booster shots in an attempt to control the spread of COVID-19, a legitimate governmental interest. Although Plaintiff consented to receive a booster, he limited his consent to one particular brand. The state's interest in controlling the spread of COVID-19 certainly was significant, but at this early stage of the pleadings, the court is unable to discern whether that interest outweighed Plaintiff's right to being fully and truthfully informed concerning the booster he was to be given. This claim will proceed for further development of the record.

B. Other Eighth Amendment Claims

Plaintiff characterized several other claims as Eighth Amendment deliberate indifference claims. He contends that Nurse DeBarros falsified medical records to make him believe he had received a J&J booster; that Dr. Valletta, Nurse DeBarros, and Nurse Oliveras failed to create a medical incident report; that Defendants Santiago and Lugo

14

disregarded his requests for video preservation of his meetings with other defendants; and that Defendant Richeson failed to tell Plaintiff when he last had ordered J&J vaccines or boosters.

To constitute an Eighth Amendment violation, the defendant's actions must have "denied [the plaintiff] the minimal civilized measure of life's necessities." *McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020) (citation and internal quotation marks omitted).  The court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk," i.e., "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original).

With respect to Nurse DeBarros's alleged falsification of Plaintiff's medical records, at this early stage of the case, the court cannot determine whether the stated allegations rise to the level of the claimed Eighth Amendment violation.  Therefore, this claim will remain for further development of the record.

With respect to the remaining Eighth Amendment allegations, the court concludes that they fail to rise to the level of a denial of "the minimal civilized measure of life's necessities." *McCray*, 963 F.3d at 117; s*ee, e.g., Hyman v. Holder*, 2001 WL 262665, at * 4-5 (S.D.N.Y. Mar. 15, 2001) (holding that failure of Defendants to create incident report does not violate a constitutional right); *Aviles v. Rodriguez*, 2019 WL 5695955, at *6 (D. Conn. Nov. 4, 2019) (dismissing claim that Defendant ignored request to preserve video footage and noting that Plaintiff failed to indicate how his constitutional rights were

violated by the failure to preserve the footage).  Specifically, the allegations that Dr. Valletta, Nurse DeBarros, and Nurse Oliveras failed to create a medical incident report, that Litigation/F.O.I. Santiago and Captain Lugo disregarded his requests for video preservation,[1] and that C.O.O. Richeson did not tell Plaintiff when he last ordered the J&J vaccine or boosters, are insufficient to satisfy the requisite Eighth Amendment standard.

    C. Conspiracy

    These claims may be construed together as a claim of conspiracy to conceal the fact that Plaintiff had been given a Moderna booster.  However, all defendants are identified as correctional employees.  Under the intracorporate conspiracy doctrine, the officers, employees, and agents of a single corporate entity are legally incapable of conspiring together.  *See Federal Ins. Co. v. United States*, 882 F.3d 348, 368 n.14 (2d Cir. 2018) (affirming application of intracorporate conspiracy doctrine to conspiracy claim brought pursuant to 42 U.S.C. § 1985).

    Although the Second Circuit has not yet considered whether the intracorporate conspiracy doctrine applies to section 1983 cases, district courts within this Circuit have applied the doctrine in such cases and, in particular, to section 1983 cases filed by prisoners.  *See, e.g., Schlosser v. Walker*, 2020 WL 7324679, at *3-4 (D. Conn. Dec. 11, 2020); *Jones v. Wagner*, 2020 WL 4272002, at *5 (D. Conn. July 24, 2020); *Edwards v.*

---

[1] Although Plaintiff characterizes the failure to preserve video footage as also violative of his rights to due process, he fails to articulate how this is so.  Furthermore, in *Avila*, this district dismissed similar claims because the plaintiff had not alleged how the failure to preserve video footage violated his constitutional rights.  *Aviles*, 2019 WL 5695955 at *6; *see also Concepcion v. Green*, 2021 WL 5988613, at *7 (D. Conn. Dec. 17, 2021) (dismissing on initial review a similar due process claim for failure to preserve video footage.).

*Annucci*, 2019 WL 1284295, at *9-10 (S.D.N.Y. Mar. 20, 2019).

An exception to the intracorporate conspiracy doctrine applies if the plaintiff can show that the defendants were "pursuing personal interests wholly separate and apart from the entity." *Ali v. Connick*, 136 F. Supp. 3d 270, 282—83 (E.D.N.Y. 2015) (citation and internal quotation marks omitted). A mere allegation that the defendants had personal bias against the plaintiff, however, is insufficient to satisfy the exception. *See Vega v. Artus*, 610 F. Supp. 2d 185, 205 (N.D.N.Y. 2009) (holding that a prisoner must do more than allege that Defendants were motivated by personal bias against him to show that they were pursuing personal interests wholly separate and apart from the entity); *see also Harris v. City of Newburgh*, 2017 WL 4334141, at *8 (S.D.N.Y. Sept. 17, 2017) (recognizing that for exception to apply, Plaintiff must plausibly allege that Defendants "acted other than in the normal course of their corporate duties"). Plaintiff alleges no facts suggesting that the defendants were acting other than in the course of their duties. Thus, the exception does not apply and Plaintiff fails to state a plausible conspiracy claim.

D. <u>Officer Greene</u>

The complaint does not mention Officer Greene in the section addressing Plaintiff's claims. The only mention of this defendant are: references to Ms. Acosta's response that she had forwarded Plaintiff's request to Officer Greene, Complaint, ECF No. 1 at ¶ 72, a response to Plaintiff's request stating that vaccines produced by Moderna, Pfizer, and J&J were administered on or around December 8, 2021, *id.* ¶ 73, the fact that Officer Greene did not indicate whether J&J produced a booster vaccine or, if so, whether it had been approved by the CDC as of December 2021, *id.* ¶ 74, and his response to a separate

letter about this same issue.  *Id.*  Plaintiff attaches to his complaint copies of grievance appeals Officer Greene rejected as repetitive.  *Id.* at 40—41.

In the section of his complaint entitled Jurisdiction and Venue, Plaintiff states that Officer Greene participated in the conspiracy against him.  *Id.* ¶ 11.  However, as previously stated, any such claim fails pursuant to the intracorporate conspiracy doctrine. Further, to the extent that the complaint may be construed to assert a claim against Officer Greene for rejecting his grievances, the claim also fails as there is no federal constitutional right to grievance procedures.  *See, e.g., Schlosser v. Manuel*, 2020 WL 127700, at \*5 (D. Conn. Jan. 10, 2020) ("Inmates have no constitutional entitlement to grievance procedures, to receive a response to a grievance, or to have a grievance processed properly." (citing cases)); *Cabassa v. Ostheimer*, 162 F. Supp. 3d 60, 63 (D. Conn. 2016) (dismissing all claims regarding effective grievance procedures or responses to grievances).  Therefore, any claims against Officer Greene hereby are dismissed.

E.  Warden Washington

Plaintiff names Warden Washington but includes no allegations against him and does not include Warden Washington in any of his legal claims.  The Second Circuit has recognized that "there is no special rule for supervisory liability," but that "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (internal citation omitted).

Plaintiff alleges no facts suggesting that Warden Washington participated in the denial of his constitutional right or even that Warden Washington was aware of Plaintiff's

concerns.  Therefore, Plaintiff fails to state a plausible claim against Warden Washington.  Any claims against Warden Washington hereby are dismissed.

F.  <u>FOIC</u>

Plaintiff lists the Freedom of Information Commission ("FOIC") as a defendant.  In the section of his complaint entitled Exhaustion of Administrative Remedies, Plaintiff alleges that he wrote to FOIC seeking preservation of the video footage of his encounters with the defendants.  ECF No. 1 at ¶ 103.  This is the only reference to facts related to a purported claim against this defendant.  FOIC is a state agency.  *See* Conn. Gen. Stat. § 1-205.  State agencies are not considered persons within the meaning of section 1983.  *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (recognizing that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983.");  *Torrence v. Pelkey, 164 F. Supp. 2d 264, 271 (D. Conn. 2001)* (observing that the State of Connecticut Department of Correction is a state agency and that "'[i]t is well-settled that a state agency is not a 'person' within the meaning of § 1983" (citing cases));  *see also Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985) ("a violation of state law is not cognizable under § 1983.");  *Crowder v. Farinella*, 2017 WL 3392546, at *6 (D. Conn. Aug. 7, 2017) (dismissing federal Freedom of Information claim and noting holding in *Pollnow*).

Accordingly, any purported claim against FOIC hereby is dismissed.  Any claim for failure to comply with his video preservation request should be pursued directly with FOIC.  *See University of Conn. Health Ctr. v. Freedom of Information Comm'n*, 2012 WL

1003757, at *1 (Conn. Super. Ct. Feb. 27, 2012) (noting that plaintiff had commenced action by appealing to Connecticut FOIC alleging failure to respond to requests).

      G. <u>State Law Claims</u>

      Plaintiff includes state law claims for negligent and intentional infliction of emotional distress.  The federal court's supplemental jurisdiction is governed by 28 U.S.C. § 1367(a), which provides that "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  Based on the limited record, Plaintiff has stated sufficient facts to support this court's pendent jurisdiction over the state law claims for infliction of emotional distress against Nurse DeBarros as they are based on the same conduct forming the basis of the purported federal claims and "form part of the same case or controversy" as those claims. *Id.*

      However, a district court has discretion to retain or to decline supplemental jurisdiction over state law claims asserted against defendants who have no federal claims pending against them.  *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (noting that the court can exercise supplemental jurisdiction over a state law claim even if "asserted against a party different from the one named in the federal claim" but "[t]he fact that the district court has the power to hear these supplemental claims does not mean, of course, that it must do so.  Instead, it may decline to exercise its power based on the factors laid out in 28 U.S.C. § 1367(c)."); *Kaplan v. County of Orange*, 528 F. Supp. 3d 141, 160-61 & n.6 (S.D.N.Y. 2021) (declining to exercise

jurisdiction over state law claims against certain defendants against whom no federal claims were pending, discussing discretion to do so, and citing cases).  Specifically, Section 1367(c) of Title 28 of the United States Code provides that one of the bases on which "the courts may decline to exercise supplemental jurisdiction over a claim" is the circumstance in which "the district court has dismissed all claims over which it has original jurisdiction . . . ."  28 U.S.C. § 1367.

The court declines to exercise supplemental jurisdiction over any state law claims asserted against defendants against whom all federal claims have been dismissed.

## IV.    ORDERS

The claims for violation of Plaintiff's Eighth Amendment rights based on the allegations that Dr. Valletta, Nurse DeBarros, and Nurse Oliveras failed to create a medical incident report, that Litigation/F.O.I. Santiago and Captain Lugo disregarded Plaintiff's requests for video preservation, and that C.O.O. Richeson did not tell Plaintiff when he last ordered the J&J vaccine; the conspiracy claims; the purported claims against Officer Greene and Warden Washington; the claims against FOIC; and any state law claims against the defendants against whom federal claims have been dismissed, hereby are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1).  Only the claimed violations of the Fourteenth and Eighth Amendments and of state law as to Nurse DeBarros will proceed for further development of the record.

The court enters the following additional orders:

21

(1)   **The Clerk shall:** verify with the Department of Correction Office of Legal Affairs the current work address for RN Adriana DeBarros; mail to her at that confirmed address (within **twenty-one (21) days** of this Order) a waiver of service of process request packet containing the Complaint and this Order; and report to the court (on the thirty-fifth day after mailing) the status of the waiver request.  If the defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service on the defendant (in her individual capacity) by the U.S. Marshals Service, in which case RN DeBarros shall be required to pay the cost of such service.

(2)   **The Clerk shall** prepare a summons form and send an official capacity service packet to the U.S. Marshal Service.  The U.S. Marshal is directed to effect service of the complaint on the individual defendant in her official capacity at the Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 0610, within **twenty-one (21) days** from the date of this order and to file a return of service within thirty (30) days from the date of this order.

(3)   **The Clerk shall** send Plaintiff a copy of this Order.

(4)   Defendant shall file her responses to the complaint (either an answer or a motion to dismiss) within **sixty (60) days** from the date the waiver forms are sent.  If she chooses to file an answer, she shall admit or deny the allegations and shall respond to the cognizable claims recited above.  She also may include all additional defenses permitted by the Federal Rules.

(5)   Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this Order.  Discovery

requests need not be filed with the court.

(6)     All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this Order.

(7)     Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed.  If no response is filed, or if the response is not timely, the dispositive motion can be granted absent objection.

(8)     If Plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court.  Failure to do so can result in the dismissal of the case.  Plaintiff must give notice of a new address even if he is incarcerated. Plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address.  If Plaintiff has more than one pending case, he should list each case number in the notification of change of address.   Plaintiff also should notify Defendants (or the attorney for Defendants) of his new address.

(9)     Plaintiff shall utilize the Prisoner Electronic Filing Program when filing documents with the court.  Plaintiff is advised that the Program may be used only to file documents with the court.  As local court rules provide that discovery requests are not filed with the court, discovery requests must be served on Defendant's counsel by regular mail.  In addition, Plaintiff must serve copies of all documents by regular mail as to any defendant who does not participate in electronic filing.

(10)     The Clerk shall immediately enter the District of Connecticut Standing Order

Re: Initial Discovery Disclosures concerning cases initiated by self-represented inmates and shall send a copy to Plaintiff.

      **IT IS SO ORDERED** at Hartford, Connecticut, this 3rd day of April, 2023.

                        /s/

                     Omar A. Williams
                     United States District Judge